Nos. 15-55800, 15-55872

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————

ITN FLIX, LLC and GIL MEDINA,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

GLORIA HINOJOSA and AMSTEL, EISENSTADT, FRAZIER, & HINOJOSA
TALENT AGENCY,

*Defendants-Appellees,*

and

ROBERT RODRIGUEZ; MACHETE KILLS, LLC; EL CHINGON, INC.;
TROUBLEMAKER STUDIOS, L.P.; and QUICK DRAW PRODUCTIONS,
LLC;

*Defendants-Appellees/Cross-Appellants.*

———————————————

On Appeal from the United States District Court of the
Central District of California, No. 15-cv-08797-ODW-RZx
Honorable Otis D. Wright II

———————————————

## APPELLANTS' REPLY AND ANSWERING BRIEF ON CROSS-APPEAL

———————————————

Edward M. Anderson
Regina Yeh
ANDERSON YEH PC
401 Wilshire Boulevard, 12th Floor
Santa Monica, CA 90401
Telephone: (310) 496-4270

*Attorneys for Plaintiffs-Appellants/Cross-Appellees*

## **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................1

II.    SUMMARY OF ARGUMENT.................................................4

III.   EXISTING AND POTENTIAL FACTUAL ALLEGATIONS.....................6

A.   The Parties Had Overlapping Relationships With Trejo From 2003 Forward 6

B.   Medina Conceives What Becomes The "Vengeance" Project, And Hinojosa Is Aware Of It And Even Works On It ................................................8

C.   Trejo Was An Actor And A Producer On The "Vengeance" Project And It Was Produced Pursuant to SAG Rules.................................................9

D.   Plaintiffs And Trejo Create A First Cut Of The Film In 2005 And Rodriguez Passes On It.........................................................................9

E.   Plaintiffs And Trejo Move Forward On Their Own .....................................10

F.   The MLA ...............................................................................11

G.   Plaintiffs And Trejo Test Market An Improved Version Of The Picture In A Few Midwest Theaters And Decide It Needs More Work (And More Money) ..13

H.   The Acting Agreement ...................................................................14

I.    Trejo's Work On "Machete" Eliminates Plaintiffs' Exclusivity Hopes Well Before 2012, But Plaintiffs And Trejo Decide To Proceed Forward With Trejo Doing Both Projects..............................................................14

J.   Defendants Were Aware Of The Ongoing Business Relationship Between Plaintiffs And Trejo Post-"Machete".................................................16

K.   Plaintiffs Gain Traction  For A Competing Release To "Machete Kills" Supported In Part By Steve And Janet Wozniak, And Defendants Crush It To Appease Rodriguez's Investors ...........................................................17

L.   Summary Of Plaintiffs' Disrupted Expectancies Already Plead Or That Plaintiffs Could Plead By Amendment.................................................21

IV.   DISMISSAL ORDER.......................................................................22

V.    SCOPE OF REVIEW AND ISSUES OF APPARENT AGREEMENT ......23

VI.   THE RELEVANCE OF PLAINTIFFS' EVIDENTIARY SUBMISSIONS

ON THE ANTI-SLAPP MOTION IS TESTED HERE BY *TWOMBLY* AND FED.

R. CIV. PROC. 11, AND NOT WHETHER THE EVIDENCE WOULD BE

FULLY ADMISSIBLE AT TRIAL ......................................................................24

VII.   PLAINTIFFS HAVE MET THEIR BURDEN ON THEIR APPEAL AND

THE ORDER SHOULD BE REVERSED AND THE CASE REMANDED ........28

A.  Under Fed. R. Civ. P. 12(b)(6) and *Twombly* Standards, it was Error to
Dismiss Plaintiffs' Claims with Prejudice Based on the District Court's
Conclusive Interpretation of the MLA and Acting Agreement at the Pleadings
Stage..............................................................................................................28

   1.   Well-Settled Contract Principles of Severability, Modification, Novation,
   and Promissory Estoppel Could Cure Any Defects in Plaintiffs' Claims Based
   on Either the Acting Agreement and MLA .....................................................29

      i.   The MLA is Relevant to Rodriguez .......................................................30

      ii.  Severability..........................................................................................31

      iii. Modification .........................................................................................33

      iv.  Promissory Estoppel............................................................................34

      v.   Novation ..............................................................................................34

      vi.  Defendants' Waiver Arguments Should be Rejected .............................35

   2.   Defendants Misstate the Law on Non-Compete Covenants ......................36

      i.   In-Term Versus Post-Term Covenants Not to Compete Post-*Edwards* ..36

      ii.  Likewise, Utah Law Does Not Dictate that the Acting Agreement is
      Invalid as a Matter of Law...........................................................................37

      iii. Defendants Do Not Provide Any Authority to Contradict that the MLA is
      an Enforceable Assignment of Trejo's Right of Publicity .............................37

B.  The District Court Erred in Dismissing Plaintiffs' Claims Under Fed. R. Civ.
P. 12(b)(6) and *Twombly* Standards......................................................................39

1.   Plaintiffs Sufficiently Plead Tortious Interference Claims, Or, At A Minimum, Have Established That Granting Plaintiffs Leave To Amend To Try To Do So Would Not Be Futile .........................................................................39

i.   Plaintiffs Sufficiently Plead Knowledge of The MLA And Acting Agreement, Or Could Amend To Do So .......................................................39

ii.  Plaintiffs Sufficiently Allege an Independent Wrong in Connection with Their Intentional Interference with Prospective Economic Relationships Claims, Or Could Amend To Do So ..............................................................41

iii. The Allegations Regarding the Contractual and Prospective Relationships and Damages are Not Overly Speculative, And Plaintiffs Could Amend To Plead With a High Degree of Specificity If Needed ........43

iv.  The Intentional Interference with Economic Relations Claim Brought under Utah Law Should be Allowed to Proceed ............................................44

2.   Plaintiffs Sufficiently Pled Negligence ......................................................45

C.  Leave to Amend Should Have Been Granted ................................................48

VIII.  RODRIGUEZ'S CROSS-APPEAL SHOULD BE DENIED ......................49

A.  The Anti-SLAPP Statute Applies Only When the "Gravamen or Principal Thrust" of the Claim is Protected Activity ........................................................49

B.  The Gravamen Of Medina's Claims Is Rodriguez's and Hinojosa's Business Misconduct in Crushing a Competing Creative Project ......................................50

C.  At Best for Rodriguez, Medina's Complaint Presents "Mixed Causes of Action" and the Better Rule is that Such Mixed Causes of Action be Allowed to Proceed ................................................................................................................52

D.  Prejudicial Dismissal of Medina's Claims Are Not Properly Before This Court on an Anti-SLAPP Basis In Any Event to the Extent Any Question Turns on Evidentiary Determinations, or If Medina Can Show Leave to Amend Would Not Be Futile .......................................................................................................54

E.  Medina Has Established that his Claims have "Minimal Merit" ..................55

F.  No Attorneys' Fees Should be Awarded Under California's Anti-SLAPP Statute ..................................................................................................................60

IX.    CONCLUSION..............................................................................................60

CERTIFICATE OF COMPLIANCE.......................................................................62

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Aguilar v. Goldstein*, 207 Cal.App.4th 1152 (2012)..................................................49

*Allen v. Rose Park Pharmacy*, 237 P.2d 823, 828 (Utah 1951) .............................37

*Allied N. Am. Ins. Brokerage Corp. v. Woodruff–Sawyer,* 2005 WL 6583937 (N. D. Cal., Feb. 22, 2005)..........................................................................................31

*Bad Ass Coffee Co. of Hawaii v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237 (D. Utah 2009) ......................................................................................................37

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988)..................48

*Baral v. Schnitt*, ⸺ Cal.4th ⸺, 186 Cal.Rptr.3d 840 (2015) ................... 53, 54

*Barker v. W. Union Tel. Co.,* 134 Wis. 147 (1908) ................................................47

*Biakanja v. Irving,* 49 Cal.2d 647, 650 (1958) ......................................................45

*Braun v. Chronicle Publ'g Co.*, 52 Cal.App.4th 1036, 1043 (1997) ......................50

*Brown v. Elec. Arts, Inc.*, 722 F.Supp.2d 1148, 1156 (C.D. Cal. 2010).................60

*California Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1185 n. 18 (9th Cir. 2007) .................................................................................................35

*Cho v. Chang*, 219 Cal.App.4th 521, 526 (2013) ...................................................53

*City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002) .............................................49

*Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.*, 977 P.2d 541, 548 (Utah 1999) ....................................................................................................................33

*Comedy Club, Inc. v. Improv W. Associates*, 553 F.3d 1277, 1291 (9th Cir. 2009)36

*Davies Mach. Co. v. Pine Mountain Club, Inc.*, 39 Cal.App.3d 18, 25 (1974).......34

*Dayton Time Lock Service, Inc. v. Silent Watchman Corp.*, 52 Cal.App.3d 1 (1975) ....................................................................................................................36

*Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal.4th 376, 392-393 (1995)........44

*Diamond Woodworks, Inc. v. Argonaut Ins. Co.,* 109 Cal.App.4th 1020, 1038 (Cal.Ct.App.2003).........................................................................................33

*Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal.App.4th 873, 884 (2011)...............................................................................................................51

*Edwards v. Arthur Andersen LLP,* 44 Cal.4th 937 (2008) ...................................5, 36

*Fanucchi & Limi Farms v. United Agri Products*, 414 F.3d 1075, 1082 (9th Cir. 2005) ................................................................................................................35

*Fields v. QSP, Inc.,* No. CV 12-1238 CAS PJWX, 2012 WL 2049528, at *10 (C.D. Cal. June 4, 2012) .........................................................................................32

*Gardner v. Martino,* 563 F.3d 981, 991 (9th Cir. 2009)..........................................60

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 63 F.Supp.2d 1127, 1130 (N.D. Cal. 1999)................................................................................................50

*Hayes v. Cty. of San Diego*, 658 F.3d 867, 871 (9th Cir. 2011) ..............................54

*Hilton v. Hallmark Cards*, 580 F.3d 874, 884 (9th Cir. 2009) ................................52

*Holmes v. Summer,* 188 Cal.App.4th 1510, 1519 (2010) ........................................46

*Horman v. Gordon,* 740 P.2d 1346, 1352-53 (Utah Ct. App. 1987) .......................34

*Hunt v. Smyth,* 25 Cal.App.3d 807, 818 (1972)........................................................34

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2012 WL 1322884, at *3 (C.D. Cal. Apr. 16, 2012) ...............................................................................45

*J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 804 (1979) ...............................................45

*Jones v. Humanscale Corp.,* 130 Cal.App.4th 401, 413 (2005) ...............................31

*Kanbar v. O'Melveny & Myers*, 849 F.Supp.2d 902 (N.D. Cal. 2011) ...................31

*Kelton v. Stravinski*, 138 Cal.App.4th 941, 946 (2006)...........................................36

*KNB Enterprises v. Matthews,* 78 Cal.App.4th 362, 366 (2000) ............................38

*Lambertsen v. Utah Dep't of Corr.,* 922 F. Supp. 533 (D. Utah 1995) ...................37

*Laughlin v. Haberfelde*, 72 Cal.App.2d 780, 785-86 (1946)...................................29

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013)..........................26

*Mann v. Quality Old Time Serv., Inc.*, 120 Cal.App.4th 90, 106 (2004).......... 53, 60

*Marathon Entertainment, Inc. v. Blasi*, 42 Cal.4th 974 (2008)...............................46

*Martinez v. Metabolife Internat., Inc.,* 113 Cal.App.4th 181, 193 (2003) .............49

*Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ....................26

*Mgmt. Servs. Corp. v. Dev. Associates*, 617 P.2d 406, 408 (Utah 1980) ...............33

*Mindy's Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) ..................25

*Moran v. Endres,* 135 Cal.App.4th 952, 956 (2006) ...............................................60

*Navellier v. Sletten,* 29 Cal.4th 82, 95 (2008).........................................................54

*Neitzke v. Williams,* 490 U.S. 319 (1989)................................................................43

*Oasis W. Realty, LLC v. Goldman*, 51 Cal.4th 811 (2011)......................................54

*Orion Tire Corp. v. Goodyear Tire & Rubber Co., Inc.,* 268 F.3d 1133, 1138 (9th Cir. 2001) ...........................................................................................................38

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1127 (1990) ..........40

*Raedeke v. Gibraltar Sav. & Loan Assn.*, 10 Cal.3d 665, 672 (1974).....................34

*Ramona Manor Convalescent Hosp. v. Care Enterprises*, 177 Cal.App.3d 1120, 225 (1986).........................................................................................................40

*Reusche v. California Pac. Title Ins. Co.*, 231 Cal.App.2d 731, 736 (1965) ..........56

*Riggs v. Prober & Raphael,* 681 F.3d 1097, 1104 (9th Cir. 2012) .........................35

*Rogers v. Home Shopping Network, Inc.*, 57 F.Supp.2d 973, 979-82 (C.D. Cal. 1999) ...................................................................................................................26

vi

*Santana v. Cty. of Yuba*, 2016 WL 1268107 at *11 (E.D. Cal. Mar. 31, 2016) ......27
*Savage v. Pac. Gas & Elec. Co.*, 21 Cal.App.4th 434, 26 Cal.Rptr.2d 305, 314 (1993) ...................................................................................................................57
*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393 (9th Cir. 1986)48
*Sebastian Int'l, Inc. v. Russolillo*, 162 F.Supp.2d 1198, 1203 (C.D. Cal. 2001) .....40
*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ...................................................................................................................25
*Shropshire v. Fred Rappaport Co.*, 294 F.Supp.2d 1085, 1101 (N.D. Cal. 2003)..27
*Silver v. Goldman Sachs Grp., Inc.*, No. CV 10-4961 RSWL AJWX, 2011 WL 1979241, at *3 (C.D. Cal. May 19, 2011) ...........................................................29
*Sosa v. Paulos*, 924 P.2d 357, 363 (Utah 1996) .....................................................32
*Sutherland v. Barclays Am. / Mortgage Corp.,* 53 Cal.App.4th 299, 312 (1997) ...34
*Sys. Concepts, Inc. v. Dixon*, 669 P.2d 421 (Utah 1983).........................................37
*Timed Out, LLC v. Youabian, Inc.,* 229 Cal.App.4th 1001 (2014).........................38
*Tuszynska v. Cunningham*, 199 Cal.App.4th 257, 267 (2011) ................................55
*U.S. ex. rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-73 (9th Cir. 1999)..................................................................................................26
*United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004). ................35
*United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2015 WL 6955086, at *8 (N.D. Cal. Nov. 10, 2015).............................................................................. 53, 54
*Varian Medical Systems, Inc. v. Delfino*, 35 Cal.4th 180, 192 (2005) ....................24
*W. Union Tel. Co. v. Bowman*, 141 Ala. 175 (1904) ...............................................47
*Winston Research Corp. v. Minnesota Mining and Mfg. Co.,* 350 F.2d 134, 140 (9th Cir. 1965);...........................................................................................31
*World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*, 172 Cal.App.4th 1561, 1569 (2009) ...................................................................................................................50
*Yee v. Escondido,* 503 U.S. 519, 534 (1992) ..........................................................35
*Youngblood v. Auto-Owners Ins. Co.,* 158 P.3d 1088, 1092 (Utah 2007) ..............34
*Zajicek v. Kool Vent Metal Awning Corp.,* 283 F.2d 127, 131 (9th Cir. 1960).......31

## Statutes

*Cal. Bus. & Prof. Code* § 16600 .................................................................... 29, 36
*Cal. Bus. & Prof. Code* § 16600. ..........................................................................31
*Cal. Civ. Code* § 153 ..............................................................................................34
*Cal. Civ. Code* §§ 1530 ..........................................................................................34
*Cal. Civ. Code.* § 1698 ...........................................................................................33
*Cal. Code Civ. Proc.* § 425.16 ..................................................... 22, 24, 25, 26, 51

**Rules**

*Fed. R. Civ. Proc.* 12(b)(6) ............................................................ 22, 23, 43, 54, 60

*Fed. R. Evid.* 801(d)(2) ................................................................................ 57, 58

*Fed. R. Evid.* 804(b)(3) ................................................................................ 57, 58

**Treatises**

1 WITKIN, SUMMARY 10TH (2005) *Contracts*, § 964, p. 1055 ................................33

RESTATEMENT (SECOND) OF TORTS § 766 (1979). ...................................................40

## I.      INTRODUCTION

Plaintiffs-appellants and cross-appellees Gil Medina and ITN Flix, LLC (together, "Medina" or "Plaintiffs") had a "Plan A" that was forced to yield many years ago to a "Plan B."  Their Plan A, *circa* 2006, was to have a business relationship with third party film and television actor Danny Trejo ("Trejo") that gave Plaintiffs some limited exclusivity on Trejo's acting services for a planned vigilante action film franchise, originally entitled "Jack's Law," and later, "Vengeance."  Plaintiffs also wanted exclusivity or royalty rights for certain kinds of work keying off of Trejo's right of publicity, including merchandising, commercials and personal appearances.

Plaintiffs' Plan A is part of the story that Plaintiffs wish to tell in litigating their case.  However, the thrust of Plaintiffs' lawsuit is Defendants' alleged improper conduct in crushing Plaintiffs' Plan B in 2012, six years after the 2006 agreements were signed, and six years where Plaintiffs and Trejo worked together more or less continuously.  That is why Plaintiffs desire to proceed with claims against defendants-appellees Gloria Hinojosa – Trejo's talent agent – and her talent agency, Amsel Eisenstadt Frazier and Hinojosa Talent Agency (together, "Hinojosa") and defendants-appellees and cross-defendants Robert Rodriguez – a

well-known director and producer – and his production entities (together "Rodriguez")[1] (Hinojosa and Rodriguez together, "Defendants").

Not only did Plaintiffs' Plan B not depend on exclusivity, it counted on not having it. When Trejo took the lead role in Rodriguez's first "Machete" film, and when he took the same role again in "Machete Kills," exclusivity clearly evaporated. Medina and Trejo decided to continue their relationship nonetheless. Trejo performed services on the "Machete" films, but still continued to work with Plaintiffs on "Vengeance," and also on merchandising, commercials, and personal appearances. Medina did this in large part based on post-2006 promises and representations by Trejo that if Plaintiffs continued to put money and resources into such efforts, they could count on Trejo's support "all the way to bank" (3 ER 465:23-26, 485:11-18), even though Trejo had taken the "Machete" role.

Indeed, ironically, the reason this lawsuit exists is that in 2012, it suddenly looked like Plaintiffs' non-exclusive Plan B was going to result in far more success for "Vengeance" than Plan A ever had. In 2012, thanks in part to a fortuitous relationship with Apple Computer co-founder Steve Wozniak and his wife, Plaintiffs had real traction on a meaningful commercial release of an improved version of "Vengeance," in direct competition with Rodriguez's "Machete Kills,"

---

[1] The Rodriguez entity defendants here are Machete Kills, LLC, El Chingon, Inc., Troublemaker Studios, L.P., and Quick Draw Productions, LLC. (2 ER 24, 26:26-28:9; *see also* 2 ER 267:6-14.)

including to the point of in-theater trailers and active negotiations with specific theatrical distributors. The release died when Trejo and the Wozniaks both withdrew their support.

Plaintiffs contend that Trejo and the Wozniaks withdrew due to improper conduct by Defendants, who took steps intentionally to kill Plaintiffs' release plans, motivated by a desire to appease Rodriguez's investors in "Machete Kills," who expected some exclusivity of their own regarding Trejo's services.

Defendants advance a host of arguments as to why Medina should not be allowed back in the district court. Apart from continuing to pound on the invalidity of the exclusivity provisions in the 2006 contracts (provisions on which Medina had not depended for many years), Defendants most fervently argue that Medina has no evidence that the Defendants did anything wrong towards him or his relationships. Rodriguez is particularly emphatic about this, because he made an anti-SLAPP motion. Indeed, he seeks to task Plaintiffs with producing trial-admissible evidence of Rodriguez's wrongdoing before allowing the case to proceed further.

Plaintiffs might be able to meet that high hurdle, but the hurdle that Plaintiffs actually must overcome here is lower than that. Even where Rodriguez has made an anti-SLAPP motion, and even assuming Rodriguez had met his burden of establishing applicability of section 425.16 to Plaintiffs' claims, the

3

hurdle that Plaintiffs must clear to litigate further before the district court is only to show that leave to amend would not clearly be futile. That standard is not one that requires that a plaintiff have all of their trial admissible evidence in hand prior to discovery.

In opposition to the anti-SLAPP motion, Plaintiffs submitted ample material supporting that, at a bare minimum, even if their initial complaint is flawed, Plaintiffs have the potential to amend and bring viable claims against Defendants within the rules applicable to federal pleading.

Plaintiffs respectfully submit that they have met their burden here and that the district court's order should be reversed, including as to its premature conclusions on contractual interpretation, but at a bare minimum this Court should allow Plaintiffs leave to re-plead regardless.

## II.    SUMMARY OF ARGUMENT

The dismissal order should be reversed, at a bare minimum to give Plaintiffs an opportunity to amend their pleadings. The district court legally erred in conclusively interpreting the 2006 agreements to be entirely illegal based on their royalty and exclusivity provisions. In doing so, the district court improperly disregarded Plaintiffs' express allegations that the Agreements were partly written and partly oral, and also disregarded allegations and arguments that extrinsic evidence was relevant to the interpretation of the agreements. There is also at least

an ambiguity as to whether *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937

(2008) applies to in-term non-competition covenants, and if Utah law applies to the

Acting Agreement, then the Acting Agreement's exclusivity provision is subject to

a reasonableness analysis that requires fact finding. With respect to the MLA,

Defendant Hinojosa's arguments that it should not be interpreted as a right of

publicity transfer only serves to make Plaintiffs' point that the interpretation of the

MLA is ambiguous. Plaintiffs also show that they could amend to plead

alternative theories of enforceability of their contracts with Trejo.

As to Plaintiffs' interference claims, Defendants' arguments are mainly

premised on disregarding the actual allegations of the Complaint. Plaintiffs have

adequately refuted the district court's finding that the non-Trejo relationships at

issue were not alleged with sufficient specificity, but in any event, Plaintiffs have

identified the relationships with specificity in their anti-SLAPP opposition material

such that leave to amend is required.

As to Plaintiffs' negligence claims, Hinojosa's interpretation of negligence

law is unduly narrow, she does not fully acknowledge the extent of her relationship

to Plaintiffs and their film project, nor does she have any explanation for why she

would not make a requested correction of an egregiously false statement by a rogue

employee or contractor, if that is what occurred.

With respect to the anti-SLAPP motion, Plaintiffs and Rodriguez agree that the district court's order must be analyzed as an exercise of the district court's *sua sponte* dismissal powers pursuant to *Fed. R. Civ. Proc.* 12(b)(6); however, the dismissal with prejudice should be reversed and Rodriguez's cross-appeal should be denied. Rodriguez did not meet his burden of establishing that the gravamen of Plaintiffs' claims arose from protected conduct, nor could he. Even if it did, where Plaintiffs had no opportunity for discovery, the motion must be analyzed under *Fed. R. Civ. Proc.* 12(b)(6) principles, and Plaintiffs have submitted ample evidence that leave to amend must be granted.

### III. EXISTING AND POTENTIAL FACTUAL ALLEGATIONS

The facts set forth below are based on the Complaint's allegations, supplemented by what the record shows Plaintiffs could plead if allowed leave to amend. Citations to material beyond the Complaint are preceded by the notation "*see*" or "*see also.*"

### A. The Parties Had Overlapping Relationships With Trejo From 2003 Forward

Plaintiffs are independent filmmakers based in Utah. (2 ER 25:26-26:10; *see also* 3 ER 445.) Medina met actor Danny Trejo in 2003, while Trejo was in Utah filming "The Crow: Wicked Prayer," and the two quickly became friends and business partners. (2 ER 29:4-30:17, 32:4-9, 32:18-26; *see also* 3 ER 446:5-447:25, 503-508.) Hinojosa is Trejo's long-time talent agent. (2 ER 26:13-16,

6

33:14-21; *see also* 3 ER 489:1-6, 490:1-4, 491:12-16; 5 ER 833:13-16, 836:2-5, 838:10-12.)  Rodriguez has cast Trejo in many film projects over the course of many years.  (2 ER 29:4-23, *see also* 2 ER 269:3-16.)

When Medina and Trejo met, Trejo was already an established character actor, but he was not seen as able to carry an action film franchise as the lead, and he had never been cast that way.  (2 ER 29:4-23; *see also* 3 ER 449:9-14-450:9, 516-530; 4 ER 534-540.)  Trejo was dissatisfied with the mainstream Hollywood entertainment industry for this reason.  (2 ER 29:18-30:9; *see also* 3 ER 443:3-450:9, 450:20-25.)  This included some dissatisfaction in his relationship with Hinojosa, who counseled Trejo that he would always be a character or supporting actor and to stick with what he was good at.  (2 ER 29:18-30:9; *see also* 3 ER 450:5-9, 450:20-25.)  Rodriguez used Trejo in projects from time to time, but in the 2003 and 2004 timeframe, still not as an action hero lead – Trejo was not the star of the projects.  (2 ER 29:4-30:9; *see also* 3 ER 449:23-450:9, 516-530; 4 ER 534-540.)

Trejo quickly came to treat Medina as a creative consultant, business advisor and partner.  (2 ER 29:4-30:9; *see also* 3 ER 446:2-447:27.)  Trejo arranged for Medina to attend the 2003 world premiere in New York City of Rodriguez's "Once Upon A Time In Mexico," a film in which Trejo had an acting role.  (*See* 3 ER

448:1-449:6, 509-514.)  At the premiere, Trejo introduced Medina to Rodriguez as Trejo's business partner.  (*See* 3 ER 448:23-27.)

## B. <u>Medina Conceives What Becomes The "Vengeance" Project, And Hinojosa Is Aware Of It And Even Works On It</u>

In or about 2004 or 2005, Medina wrote a script for a vigilante action film, with Trejo in mind, with Trejo's approval.  (2 ER 30:21-17; *see also* 3 ER 450:10-25.)  They sought to obtain rights in the "Death Wish" name from Paramount Pictures, but Paramount declined.  (*See* 3 ER 451:23-26; 4 ER 572-573.)  Medina and Trejo decided to push forward and make the movie under the initial title "Jack's Law," and Trejo signed a letter of intent to that effect.  (2 ER 30:18-31:2; *see also* 3 ER 452:1-19; 4 ER 576-577.)

In his anti-SLAPP submission, Medina states that by January 2005, Medina and Hinojosa had been introduced and Trejo had explained to her that Medina was Trejo's friend and business partner, and that Trejo valued Medina's opinion.  (*See* 3 ER 451:3-6.)  Medina also provided copies of text messages showing Medina's direct interactions with Hinojosa on Trejo projects as early as January 2005.  (*See* 3 ER 451:7-19; 4 ER 559-571.)[2]

---

[2] Medina's anti-SLAPP submission includes a number of documents bearing Bates numbering prefixed with "GH." (*See, e.g.*, 4 ER 559-571.)  These documents were produced by Hinojosa in the arbitration proceedings between Medina and Trejo, and she authenticated them in an arbitration deposition.  (3 ER 451:7-19.)

### C. Trejo Was An Actor And A Producer On The "Vengeance" Project And It Was Produced Pursuant to SAG Rules

Trejo was not only an actor on the "Jack's Law" project, but also a producer. (2 ER 30:10-17; *see also* 3 ER 445:22-26.) Medina submitted multiple documents showing his interactions with Hinojosa regarding the business terms for Trejo's participation in the project, including short form contracts as early as 2005. (*See* 3 ER 455:7-24; 4 ER 593-597.) Medina also shows that "Jack's Law" was produced in compliance with SAG rules (or intended to be), and that Hinojosa assisted in facilitating this or was certainly at least aware of it. (*See* 3 ER 454:18-20, 455:11-14; 4 ER 593-594, 598-599.) The film has a cast that includes other recognizable actors, many recruited by Trejo, and some of whom were also Hinojosa clients. (2 ER 30:10-17; *see also* 3 ER 452:20-21, 453:27-454:17.)

### D. Plaintiffs And Trejo Create A First Cut Of The Film In 2005 And Rodriguez Passes On It

Plaintiffs and Trejo filmed the first cut of "Jack's Law" in September 2005, entirely in Utah. (2 ER 30:10-17; *See* 3 ER 452:22-26; 4 ER 578-582.) Medina financed the film largely from his own personal assets, and many of the expenditures were for Trejo's direct benefit. (2 ER 30:10-17, 32:4-9; *see also* 3 ER 454:18-455:6; 4 ER 587-592.) Hinojosa did work on and with the project and she knew the business terms between Plaintiffs and Trejo. (*See* 3 ER 455:7-24; 4 ER 593-597.) She made clear to both Plaintiffs and Trejo that she did not care for

9

the project, and in his anti-SLAPP motion, Medina submitted emails from Hinojosa to third parties that appear to confirm Hinojosa's antipathy. (*See* 3 ER 455:15-24; 4 ER 600-605, 613-615.)

During this 2005 timeframe while Trejo was working closely with Plaintiffs, Trejo also continued to maintain contact with and work with Rodriguez. (*See* 3 ER 456:7-14.) Medina declares that he personally witnessed Trejo discussing the "Jack's Law" project with Rodriguez that Trejo was working with Medina on it, and that Rodriguez acknowledged it. (*See* 3 ER 456:7-14.)

In November 2005, with Medina's agreement, Trejo submitted a first cut of "Jack's Law" to Rodriguez, hoping he would support the project. (2 ER 30:18-25.) Medina's anti-SLAPP submissions included a copy of a Federal Express record regarding the submission to Rodriguez, as well as a copy of the film as it existed when submitted to Rodriguez in 2005. (*See* 4 ER 606-608.) Rodriguez communicated to Trejo that he had reviewed the film and was passing on it, which Trejo communicated to Medina. (2 ER 30:18-25; *see also* 3 ER 457:7-13.)

### E. **Plaintiffs And Trejo Move Forward On Their Own**

Plaintiffs and Trejo were disappointed by Rodriguez's pass, but not dissuaded. (2 ER 30:26-32:15; *see also* 3 ER 457:17-458:11.) They decided to produce the project and attempt to achieve commercial distribution on their own. (*Id.*) This involved Medina financing the film largely out of his own personal

resources, requiring him to sell assets. (2 ER 32:4-9; *see also* 3 ER 454: 18-455:1.) Trejo knew this and knew that Medina was relying on Trejo not only to act in the project, but to support it through all stages. (2 ER 31:3- 32:9; *See* 3 ER 454:18-455:1, 457:22-458:11.) Trejo was enthusiastic about the project and affirmatively promoted it, including on his own initiative. (2 ER 30:10-17; *see also* 3 ER 454:18-455:1, 457:22-458:11; 4 ER 609-612.)

Around this time, *circa* 2006, Plaintiffs and Trejo discussed having a larger overall relationship, including one that would in part be designed to help Trejo try to re-brand as a Charles Bronson-like leading action hero. (2 ER 31:3-32:9; *see* 3 ER 457:22-458:11.) Plaintiffs and Trejo came to an understanding, that was partially documented in two writings, but that was also partly oral. (2 ER 31:3-32:9; *see* 3 ER 458:12-459:27.)

## F.  **The MLA**

On April 25, 2006, Plaintiffs and Trejo signed a "Master License Agreement" ("MLA") which on its face gives Plaintiffs certain exclusive rights in Trejo's name, image and likeness on a worldwide basis for a period of 8 years and with a 5% royalty provision. (2 ER 31:3-32:3; *see also* 3 ER 458:12-459:27; 4 ER 616-627.) Although the MLA as written states that Plaintiffs would pay a cash advance of $10,000, Plaintiffs in fact paid Trejo a cash advance of $40,000 on

11

signing. (*Id.*) Trejo requested the cash form of the payments. (*See* 3 ER 458:12-459:27.)

In his anti-SLAPP opposition, Medina submitted testimony about his interpretation of the MLA's terms. (*See* 3 ER 458:26-459:27.) This includes Medina's testimony that Medina's and Trejo's respective understanding of the MLA and/or how they apply it in practice has changed over the years, and that they have discussed this expressly. (*See* 3 ER 458:26-459:27.) Hinojosa confirmed in arbitration deposition testimony that Medina and Trejo have indeed had such discussions, and that Hinojosa has participated in at least some of them. (5 ER 856:859:8.)

The MLA relationship includes marketing and promotional work related to the "Jack's Law"/ "Vengeance" project, but it was not intended to be and has not been limited to that. (2 ER 31:3-32:3, 32:18-26; *see also* 3 ER 458:26-459:27.) Medina's anti-SLAPP declaration testimony includes the following:

> 47. [Trejo] and I have had back and forth over the years about the MLA, and we both now understand that it does not require Danny to pay a percentage to ITN on monies that [Trejo] receives for acting services on films or television projects. However, ITN did understand and does mean the MLA to cover commercial endorsement work by [Trejo], whether or not related to Vengeance and whether or not the work was directly generated or negotiated by me or ITN. Some of the promotional work for which we used [Trejo]'s name, likeness and celebrity were very directly for promotion of Jack's Law and the Vengeance Franchise. [Trejo] and I discussed and we both understood that ITN and its predecessors expected [Trejo] to not only allow, but

12

actively cooperate, participate and facilitate promotion and marketing
of Vengeance and the Vengeance Franchise regardless of the MLA.

(*See* 3 ER 459:1-459:24.)

In anti-SLAPP practice, Medina also submitted documentary evidence of

merchandising, commercial and public appearances deals that Plaintiffs worked on

with Trejo pursuant to the above testimony regarding the relationship, some of it

"Vengeance" related, but much of it not. (2 ER 32:18-26; *See* 3 ER 459:24-27,

461:25-462:3, 464:25-465:4, 467:20-26, 468:1- 469:9, 471:1-10, 475:17-25; 4 ER

628-630, 656-659, 688-696 700-703, 706-708, 711-719.) The Medina-Trejo

relationship on this type of work was more or less continuous from 2006 through at

least August 2012, including through a brief period of incarceration for Medina,

and even after Trejo's casting by Rodriguez in both "Machete" and "Machete

Kills." (*Id.*) Plaintiffs' MLA work sometimes involved Hinojosa and was tracked

by her. (*See* 3 ER 468:16-22; 4 ER 697-699.) Hinojosa received a copy of the

MLA no later than November 5, 2007, and talked with both Trejo and Medina

about it. (*See* 4 ER 640-649; 5 ER 856:13-859:8.)

### G. Plaintiffs And Trejo Test Market An Improved Version Of The Picture In A Few Midwest Theaters And Decide It Needs More Work (And More Money)

By in or about June 2006, Medina and Trejo had created an improved

version of "Jack's Law" that they released in a handful of test theaters in the

Midwest. (*See* 3 ER 459:24-460:21.) Medina and Trejo traveled together during

13

the "Jack's Law" market test, and Medina again witnessed Trejo and Rodriguez telephonically discuss together that Trejo was with Medina working on the project, as a joint business project.  (*See* 3 ER 460:11-16.)  Medina and Trejo decided the film still needed work before any meaningful commercial release, and both of them agreed to keep working on it.  (*See* 3 ER 460:17-21.)  By this time, the film project had cost between $400,000 and $500,000, a large portion of which had come from Medina personally, and to continue to work on the project was going to mean putting in even more money.  (*See* 3 ER 454:18-24, 460:22-461:5.)

### H. The Acting Agreement

Medina and Trejo decided to more formally document their mutual commitment to a basic bargain: "[Trejo] to commit his acting services and promotional and marketing services and other cooperation to the Vengeance Franchise for the long term, and on [Plaintiffs'] side, to pay [Trejo] both up front and in success."  (*See* 3 ER 460:22-461:5.)  Accordingly, on or about July 22, 2006, Plaintiffs and Trejo signed an "Acting Agreement."  (2 ER 31:3-32:9; *see also* 3 ER 460:22-461:5; 4 ER 633-635.)  Plaintiffs paid Trejo another $40,000 in cash at the signing of this document, the cash form of payment again at Trejo's request.  (*See* 3 ER 461:6-11.)

### I. Trejo's Work On "Machete" Eliminates Plaintiffs' Exclusivity Hopes Well Before 2012, But Plaintiffs And Trejo Decide To Proceed Forward With Trejo Doing Both Projects

14

After the 2006 agreements, Rodriguez presented Trejo with the opportunity to star in two vigilante action films: "Machete" and its sequel, "Machete Kills." (2 ER 33:22-34:5, 36:7-38:3; *see also* 3 ER 464:5-24.) Trejo took the opportunity, and, whether Plaintiffs could have done so successfully or not, Plaintiffs chose not to sue to stop Trejo or anyone from doing that. (2 ER 27:19-23.) In his anti-SLAPP declaration, Medina submits testimony where he witnesses further telephonic conversations between Rodriguez and Trejo regarding Trejo's ongoing work with Medina, and where Medina himself had further interactions with Rodriguez in Trejo's presence. (*See, e.g.,* 3 ER 466:15-467:19.)

Even though exclusivity had evaporated, Plaintiffs and Trejo both chose not to end their relationship. Instead, they proceeded with a "Plan B" not dependent on Trejo exclusivity to Plaintiffs: Trejo would work on the "Machete" films and also still continue to work on projects with Plaintiffs. This included redoubled efforts to revise, reshoot, re-cast, edit and otherwise improve the nascent "Vengeance" film and franchise. (2 ER 32:18-26, 36:1-6, 37:20-23, 40:14-42:9; *see also* 3 ER 465:9-466:10, 468:1-8.)

Medina's anti-SLAPP materials show that Trejo sometimes advanced both the "Machete" film and "Vengeance" concurrently. (*See* 4 ER 688-690.) Trejo also continued to work with Plaintiffs on merchandising, commercials, and personal appearances, even after taking the "Machete" role. (2 ER 32:18-26, 36:1-

15

6, 37:20-23, 40:14-42:9; *see also* 3 ER 467:20-468:8.) Plaintiffs spent substantial sums on projects with Trejo even after his participation in "Machete," including based on representations from Trejo that Trejo was still committed to working with Plaintiffs, and indeed, that Plaintiffs could count on his support "all the way to the bank." (2 ER 37:3-11, 42:1-9; *see also* 3 ER 465:23-26, 485:11-18.)

## J. Defendants Were Aware Of The Ongoing Business Relationship Between Plaintiffs And Trejo Post-"Machete"

Hinojosa was well aware of Plaintiffs' relationship with Trejo, tracked it, took commissions from it, and had even seen versions of the "Vengeance" film and given Medina production notes regarding it. (2 ER 33:4-33:21, 34:13-37:18, 42:1-46:13, 51:23-25; *see also* 3 ER 489-92; 5 ER 847:21-848:5, 849:7-852:23, 853:16-887:19.) As late as July 2011, it was Hinojosa's practice to direct third party inquiries that she received regarding "Vengeance" to Medina. (*See* 3 ER 469:10-16; 4 ER 709-710.) Medina also submitted evidence in anti-SLAPP practice showing that he expected (or certainly requested) Hinojosa's assistance on distribution and marketing of the picture. (*See* 3 ER 463:24-464:4; 4 ER 650-651.) Rodriguez was also aware that Plaintiffs and Trejo were business partners, including on "Vengeance," and that Trejo had contractual obligations to Medina, including to support the "Vengeance" franchise. (2 ER 26:26-27:8, 30:18-25, 33:22-35:27, 39:1-15, 42:1-46:13, 47:26-28, 49:26-28; *see also* 3 ER 448:1-449:6, 456:7-457:13, 461:21-23, 466:15-467:19, 469:19-470:26, 472:25-473:1.)

Medina believed that Defendants were behaving improperly with respect to Medina and the "Machete" films, but, between 2006 and into 2012, the parties nonetheless all co-existed relatively peacefully, even after Trejo's work in "Machete" and "Machete Kills." (2 ER 37:19-38:3; *see also* 3 ER 469:19-470:26; 4 ER 688-690.) Medina's anti-SLAPP declaration includes testimony that beginning in May and into summer 2012, there were active discussions between Trejo and Rodriguez concerning Trejo's ability to do "Machete Kills" and still fulfill his commitments to Plaintiffs. (*See* 3 ER 470:9-20.)

### K. <u>Plaintiffs Gain Traction For A Competing Release To "Machete Kills" Supported In Part By Steve And Janet Wozniak, And Defendants Crush It To Appease Rodriguez's Investors</u>

In 2012, things changed. With Trejo's initially enthusiastic support, Plaintiffs decided to release their new and improved Trejo vigilante action film in direct competition with Rodriguez's planned release of "Machete Kills" – including because Trejo would get paid for both films. (2 ER 40:14-42:9; *see also* 3 ER 471:14-474:13; 4 ER 720-752.) Further, Plaintiffs planned to support the release with new scenes in the movie, featuring Trejo appearing with Steve and Janet Wozniak (the co-founder of Apple Computer, Inc. and his wife) as cameo characters. (*Id.*) After Trejo refused to shoot the new scenes, citing pressure from Rodriguez and Hinojosa, the plan changed to a mobile app game featuring the Wozniaks, but utilizing Trejo's image, voice, and likeness (as a stylized digital

17

character), under the MLA. (*Id.*) The plan included Plaintiffs entering into a contract with React Games to create the app, which provided for, *inter alia*, revenue sharing on in-app advertising based on the app's performance. (2 ER 40:18-27; *see also* 3 ER 473:7-14; 4 ER 720-724.)

Plaintiffs' initial steps to execute this plan resulted in "Vengeance" getting distribution interest it had not had before, and Plaintiffs believed they were on their way to a meaningful commercial release of the project. (2 ER 41:1-42:9; *see also* 3 ER 474:18-475:2, 480:10-21.) As part of his anti-SLAPP submission, Medina produced documentation of actual negotiations and related communications with specific potential distributors and exhibitors, as well as press coverage of the potential competing release. (*See* 4 ER 474:18-475:10, 753-755; 5 ER 800-806, 813-826.)

Plaintiffs contend that what happened next was this:

Investors in Rodriguez's "Machete Kills" film were surprised and upset to learn that there was a potentially competing Trejo film project and that Trejo was actively supporting it in competition with "Machete Kills." (2 ER 38:9-40:9, 42:4-47:9, 46:3-13; *see also* 3 ER 470:2-3, 474:18-475:10; 5 ER 794-796.) (*See also* Appellants' Motion to Take Judicial Notice, filed concurrently herewith.) To appease his investors, Rodriguez directed and pressured Trejo to end his relationships with Plaintiffs, including to cease doing any further work on the film

18

project with Plaintiffs, to cease any work on Plaintiffs' mobile app game, and to cease providing any marketing and promotional support for Plaintiffs' film or the game. (2 ER 42:4-47:9; *see also* 3 ER 470:2-3, 470:21-26, 472:25-27, 484-487; 5 ER 794-796, 958-960.) In addition to his direct pressure on Trejo, Rodriguez also pressured Hinojosa (possibly including through Rodriguez's producing partner Aaron Kaufman) to take steps to end the Trejo-Plaintiffs relationship, and specifically to kill the Wozniaks' support for the mobile app game. (*Id.*)

Driven by the pressure from Rodriguez, Hinojosa then contacted the Wozniaks directly and represented to Janet Wozniak that Plaintiffs were frauds; that Plaintiffs had no relationship with Trejo; that the mobile game was not authorized by Trejo; and that Plaintiffs had no movie starring Trejo, but rather used the falsity of such a movie to swindle potential investors. (2 ER 43:6-47:6.) In his anti-SLAPP submission, Medina provided email communications with a potential witness, Rick White, who would testify that Janet Wozniak called White and told White that Hinojosa had made such statements to Janet Wozniak directly. (*See* 3 ER 479:2-10; 5 ER 791-793.)

Alternatively, a rogue social media contractor or employee made such representations to the Wozniaks for the express purpose of killing the relationship between the Plaintiffs and the Wozniaks, and Hinojosa then led Janet Wozniak to believe the representations were accurate by failing to correct them when asked by

both Janet Wozniak and Plaintiffs. (2 ER 43:6-47:6.) In his anti-SLAPP submission, Medina submitted deposition testimony and documents produced by Hinojosa consistent with this second alternative theory. (*See* 3 ER 475:11-479:21; 4 ER 756-761; 5 ER 827-920, 765-769, 775-790, 794-796.)

Plaintiffs contend that as a result of defendants' conduct, Plaintiffs suffered the following:

Trejo ceased to do any more work with Plaintiffs on the "Vengeance" project and associated marketing and promotional efforts, including ceasing to support the app game. (2 ER 42:1-9, 45:22-47:6; *see also* 3 ER 477:23-481:26; 5 ER 770-788.) The Wozniaks withdrew their active support for the app game and refused to promote it, as they had previously been enthusiastic to do. (*Id.*) With the app game released but not actively marketed or promoted by Trejo or the Wozniaks, as had been represented and expected, the distribution deals that Plaintiffs had been actively negotiating with theatrical exhibitors – including already at the stage of in-theater trailers – fell apart and "*Vengeance*" never achieved a meaningful commercial release. (2 ER 41:15-23, 42:1-9, 45:22-47:6; *see also* 3 ER 477:23-483:4.) Further, as Medina can also plead more clearly if allowed to amend, as a result of the pressure from Rodriguez, Trejo ceased to do any further work with Plaintiffs on merchandising, commercials, and personal appearances, where Trejo was previously doing so regularly through at least

20

August 2012. (2 ER 32:18-26, 42:1-9, 43:22-44:7; *see also* 3 ER 482:8-12.)

Plaintiffs contend they suffered monetary damages as a result of all of the

foregoing. (2 ER 46:14-27; *see also* 3 ER 477:23-483:4.)

### L. <u>Summary Of Plaintiffs' Disrupted Expectancies Already Plead Or That Plaintiffs Could Plead By Amendment</u>

Plaintiffs contend that based on the above facts, they had at least the

following expectancies disrupted by Defendants, that they have plead or could

plead if given the chance to amend:

- Trejo ceased to fulfill his "Vengeance"-related marketing and promotional obligations under the MLA involving use of Trejo's digital name and likeness, including to participate in the Wozniak app game, due to direct pressure from Rodriguez.

- Trejo ceased to work with Plaintiffs on non-"Vengeance"-related merchandising, commercials and personal appearance opportunities that Trejo had previously done under the MLA, and Plaintiffs lost that line of business, also due to Rodriguez's pressure on Trejo.

- Trejo ceased to fulfill his obligations under the Acting Agreement on the "Vengeance" project, most particularly failing to fulfill his obligations actively to market and promote the project, due to Rodriguez's pressure on Trejo.

- Plaintiffs lost their expectancy that the Wozniaks would actively market, promote and otherwise support the app game, due to the improper conduct of both Rodriguez and Hinojosa.

- Plaintiffs' contract with React Games for the app game was frustrated by the conduct of both Rodriguez and Hinojosa.

- Plaintiffs lost their expectancies with theatrical, online and other potential distributors for distribution of the "Vengeance" picture, due to the elimination of Trejo's support and the Wozniak's support, due to the improper conduct of both Rodriguez and Hinojosa.

## IV. DISMISSAL ORDER

In response to the *Fed. R. Civ. Proc.* 12(b)(6) motion to dismiss by Hinojosa, and the *Cal. Code Civ. Proc.* § 425.16 special motion to strike by Rodriguez, the district court entered an Order dismissing Plaintiffs' entire initial Complaint without leave to amend. (1 ER 1-18.) First, the district court found that Plaintiffs could not plead any claim on Plaintiffs' relationship with Trejo, illegal restraints on trade made both agreements void. Second, the district court found that with business relationships with parties other than Trejo, Plaintiffs had not plead sufficient facts to show that the relationships were not too speculative to support claims. The Order also "grant[ed]" Rodriguez's anti-SLAPP motion, but

also stating the court was declining to analyze the applicability of the anti-SLAPP statute to Plaintiffs' claims.

## V.    SCOPE OF REVIEW AND ISSUES OF APPARENT AGREEMENT

From Rodriguez's brief, it appears that Plaintiffs and Rodriguez agree that the court may not grant a motion to strike under California's anti-SLAPP statute without actually conducting the first-stage applicability analysis.

However, Rodriguez says that the dismissal of Rodriguez with prejudice can nonetheless still be affirmed as something the district court could have done using its *sua sponte* powers pursuant to *Fed. R. Civ. Proc.* 12(b)(6), even though Rodriguez made no 12(b)(6) motion, if it was an otherwise appropriate dismissal with prejudice pursuant to 12(b)(6) principles.

Plaintiffs agree.  But the issue of whether the court can affirm the Order with respect to both Hinojosa and Rodriguez thus turns on principles of review applicable to motions to dismiss under *Fed. R. Civ. Proc.* 12(b)(6): the *de novo* question of whether Plaintiffs stated a legally sufficient claim for relief and, as to denial of leave to amend, the abuse of discretion standard tested here by, as all parties appear substantially to agree, whether leave to amend would clearly have been futile.

As discussed below, Rodriguez fails to acknowledge the procedural differences in applying the anti-SLAPP statute in federal court, particularly the rules regarding the evidence.

## VI. THE RELEVANCE OF PLAINTIFFS' EVIDENTIARY SUBMISSIONS ON THE ANTI-SLAPP MOTION IS TESTED HERE BY *TWOMBLY* AND FED. R. CIV. PROC. 11, AND NOT WHETHER THE EVIDENCE WOULD BE FULLY ADMISSIBLE AT TRIAL

Due to the conflict between California's anti-SLAPP statute and the Federal Rules of Civil Procedure, anti-SLAPP evidence cannot be reviewed at this stage for admissibility at trial (at least not in a way prejudicial to Medina). However, the submitted material may be reviewed as part of determining whether Plaintiffs can demonstrate that leave to amend would not be futile.

In 1992, California enacted *Cal. Code Civ. Proc.* § 425.16, to help protect defendants against "Strategic Lawsuits Against Public Participation," or "SLAPPs" – lawsuits designed to chill or that have the effect of chilling protected First Amendment speech and conduct, particularly petitioning activity.

The motion to strike calls for a "summary judgment-like procedure," *see, e.g., Varian Medical Systems, Inc. v. Delfino*, 35 Cal.4th 180, 192 (2005), and proceeds in two stages. First, the defendant bears the burden of making an initial *prima facie* showing that the plaintiff's challenged cause of action "arises from" an act in furtherance of the defendant's rights of petition of free speech, within the

meaning of section 425.16. If the court determines that the defendant has met this burden, the court must then proceed to a second stage, where the plaintiff bears the burden of demonstrating a reasonable probability of prevailing on the merits. Reasonable probability in California's anti-SLAPP context "requires only a minimum level of legal sufficiency and triability." *Mindy's Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010). Indeed, the second step is often called the "minimal merit" prong. *Id.* "In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Cal. Code Civ. Proc.* § 425.16(b)(2).

Rodriguez fails to acknowledge that there sharp differences in applying the statute in federal court versus state court, at least where (as here), plaintiff has not had any opportunity for discovery. In California state court, once a defendant files an anti-SLAPP motion, discovery is stayed. *Cal. Code Civ. Proc.* § 425.16(g). If the court finds that the moving defendant has met its initial burden of establishing that the cause of action arises out of protected conduct, the court then proceeds to test whether the plaintiff has established a reasonable probability of prevailing.

In federal court, however, things are different. In fact, there are voices on the Ninth Circuit that believe that California's anti-SLAPP statute should not apply in federal court at all, particularly after the Supreme Court's decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010).

*See, e.g., Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013), *pet. rehr'g en banc denied*, 736 F.3d 1180 (9th Cir. 2013), dissenting opinion. However, the current rule is that Section 425.16 may be applied to state law claims in federal court, as long as district courts mitigate aspects of the statute that are directly at odds with the Federal Rules of Civil Procedure. *U.S. ex. rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-73 (9th Cir. 1999); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).

As relevant here, the discovery limiting provisions of *Cal. Code Civ. Proc.* § 425.16, subparagraphs (f) and (g) – which prevent plaintiffs from conducting discovery before a "summary judgment like" hearing on an anti-SLAPP motion, with requirements of producing trial-admissible evidence – direct conflict with the *Fed. R. Civ. Proc.* 56, which not only does not limit discovery, but affirmatively requires that a plaintiff must have opportunity for discovery before summary judgment is considered. *Metabolife*, 264 F.3d at 846 (citing *Rogers v. Home Shopping Network, Inc.*, 57 F.Supp.2d 973, 982 (C.D. Cal. 1999)).

Accordingly, district courts in this circuit have ensured that they do not violate Rule 56 by either holding off on ruling on the motion until discovery has occurred, or by treating the motion as brought under *Fed. R. Civ. Proc.* 12(b)(6), or by holding off on ruling on the motion until discovery has occurred. *See, e.g., Rogers*, 57 F.Supp.2d at 982; *Shropshire v. Fred Rappaport Co.*, 294 F.Supp.2d

1085, 1101 (N.D. Cal. 2003); *see also Santana v. Cty. of Yuba*, 2016 WL 1268107 at *11 (E.D. Cal. Mar. 31, 2016) (combining the two approaches by ruling on anti-SLAPP challenges to legal sufficiency with leave to amend where not clearly futile, and "tabling" challenges dependent on questions of evidence until discovery is developed).

      If the court does not "table" the motion to strike, but rather treats it like a 12(b)(6) motion, this means that it tests the sufficiency of plaintiff's showing on a legal sufficiency of allegations standard, not dependent on presentation of supporting admissible evidence, and also with a futility of leave to amend standard. Whether amendment would be futile is tested by *Twombly* and *Fed R. Civ. Proc.* 11. *Twombly's* standard is one plausibility of factual allegations, while the Rule 11 standard is one that specifically does not require that the pleader have all admissible evidence in hand prior to discovery. *Fed. R. Civ. Proc.* 11(b)(3); *see also Santana,* 2016 WL 1268107 at *23 ("The motion [to strike] is granted as to the state law claims against the Yuba County defendants. . . . The plaintiffs are granted leave to amend if possible *within the confines of Federal Rule of Civil Procedure 11.*" (Emphasis added.)).

      Here, Rodriguez chose to file an anti-SLAPP motion at the inception of the case on Plaintiffs' initial Complaint, and without Plaintiffs having any opportunity for discovery. Under these circumstances, *even* if the district court had considered

Rodriguez's anti-SLAPP motion on the merits, and *even* if Rodriguez had met his burden on the first stage of the anti-SLAPP analysis, Plaintiffs could not have been tasked with a requirement of producing evidence admissible at trial to meet any burden they might have had to establish reasonable probability of prevailing.

The anti-SLAPP material nevertheless *is* still relevant for purposes of a Rule 12(b)(6) analysis. Plaintiffs can (and have) proffered the materials for the purpose of establishing that they have additional facts and legal theories that they are able to plead if given leave to do so. As addressed above, the standard on such a proffer is not dependent on the proffered material being admissible at trial; neither *Twombly* nor Rule 11 require Plaintiffs to show that the information they rely on or would rely on to support amended claims in good faith has already been developed to the level of admissibility at trial.

With the analytical smoke clouds of Rodriguez's "admissible evidence" references and arguments cleared away, it becomes easier to analyze the issues on both the appeal and cross-appeal, and clear that Plaintiffs should prevail on both.

## VII. PLAINTIFFS HAVE MET THEIR BURDEN ON THEIR APPEAL AND THE ORDER SHOULD BE REVERSED AND THE CASE REMANDED

### A. Under Fed. R. Civ. P. 12(b)(6) and *Twombly* Standards, it was Error to Dismiss Plaintiffs' Claims with Prejudice Based on the District Court's Conclusive Interpretation of the MLA and Acting Agreement at the Pleadings Stage

Where Plaintiffs' Complaint alleged that the approximately ten-year business relationship between Plaintiffs and Trejo was never entirely reduced to writing (*see* 2 ER 31:3-8); that the understandings of their obligations in the Acting Agreement and the MLA changed or were modified over time (*see, e.g.,* 2 ER 37:19, 42:1-9); and that the terms were not fully expressed in those two documents executed in 2006; a determination of the validity of Plaintiffs' contractual relationship on the basis of those documents alone is in error. *See Laughlin v. Haberfelde*, 72 Cal.App.2d 780, 785-86 (1946) ("A contract partly written and partly oral is in legal effect an oral contract. It occurs where an incomplete writing, or one expressing only a part of what is meant, is, by oral words, rounded into the full contract." (citing 6 CAL.JUR. 227)). By examining the contract solely on the base of those two written documents, the district court did not accept Plaintiffs' allegations as true, as it was required to do. This is error. *See, e.g., Silver v. Goldman Sachs Grp., Inc.*, No. CV 10-4961 RSWL AJWX, 2011 WL 1979241, at *3 (C.D. Cal. May 19, 2011).

### 1. Well-Settled Contract Principles of Severability, Modification, Novation, and Promissory Estoppel Could Cure Any Defects in Plaintiffs' Claims Based on Either the Acting Agreement and MLA

Nevertheless, Defendants defend the district court ruling, and generally with two main arguments. The first, of course, is that the agreements contain provisions that violate *Cal. Bus. & Prof. Code* § 16600 and/or Utah law. Plaintiffs further

address those arguments below. The second, however, is that the violations of Section 16600 are fatal not only to the two written agreements, but also to the entirety of Plaintiffs' alleged contractual relationship with Trejo, and that the defects in contract validity cannot be cured by examination of extrinsic evidence and/or through application of well-settled contract principles. (Hinojosa Br. at 35.)

These arguments should be rejected. Well-settled principles of contract law, as well as the existence of extrinsic evidence to support the severability, modification of the terms, novation of the contract, and/or equitable enforcement of the obligations, support that the Complaint should have been allowed to proceed or that leave to amend should have been granted.

### i.    The MLA is Relevant to Rodriguez

Rodriguez argues that the MLA is irrelevant to him, because Plaintiffs did not allege any claims for interfering with the MLA against him. (Rodriguez Br. at 27). This is not true. For instance, Plaintiffs' agreement with React Games for the creation of *Vengeance: Woz with a Coz* was in connection with the MLA for Trejo's right of publicity (i.e., the use of his likeness and voice as a character in the app: "Rodriguez was putting tremendous pressure on Trejo . . . not to fulfill Trejo's contractual obligations to PLAINTIFFS, including that Trejo should refuse to and fail to fulfill his obligations to market and promote" Vengeance. (2 ER 42:1-9.) Ultimately, Rodriguez was successful because Trejo refused to participate in the

creation of the app or to support it. (*See also* 3 ER 482:8-12 (Medina testifying that Trejo refuses to do any further merchandising, commercials and personal appearance work with Medina due to Rodriguez's instructions).) This constitutes an interference with the MLA. Moreover, if necessary, Medina has submitted ample facts to show that he could amend to make clear that the MLA is at issue with respect to Rodriguez. (*See* 3 ER 482:8-12.)

### ii. Severability

In response to Plaintiffs' arguments on severability, Hinojosa specifically argues that the "illegal" portions so thoroughly taint the contracts that the entire contractual relationship between Medina and Trejo is invalid. (Hinojosa Br. at 41.) This argument is contrary to California law. Section 16600 requires that, *if possible*, any unlawful provisions should be severed and the remainder of the agreement found enforceable. *Zajicek v. Kool Vent Metal Awning Corp.,* 283 F.2d 127, 131 (9th Cir. 1960); *see also Winston Research Corp. v. Minnesota Mining and Mfg. Co.,* 350 F.2d 134, 140 (9th Cir. 1965); *Mercuro v. Sup.Ct.,* 96 Cal.App.4th 167, 184-85 (2002); *Allied N. Am. Ins. Brokerage Corp. v. Woodruff– Sawyer,* 2005 WL 6583937 (N. D. Cal., Feb. 22, 2005).

Hinojosa ignores *Zajicek* entirely. Instead, Hinojosa cites to *Jones v. Humanscale Corp.,* 130 Cal.App.4th 401, 413 (2005) and *Kanbar v. O'Melveny & Myers*, 849 F.Supp.2d 902 (N.D. Cal. 2011) to argue that the "main objective of

the parties' contract" to determine whether severability should be allowed.

(Hinojosa Br. at 41.) This is misleading. *Jones* actually finds an unlawful

provision as only a portion of the contract, so the remainder was enforceable.

*Kanbar* does not address section 16600 at all. Nevertheless, Hinojosa repeatedly

argues that the "exclusivity" provisions in the two agreements are at the "heart" of

the agreements and that the intent of the parties does not indicate that severance

should apply (even with respect to the MLA, which contains a severability

provision). But it is clear that under *Zajicek*'s standards, severance should apply.

Tellingly, that the exclusivity provisions were not impossible to sever is

fatally belied by the fact that Plaintiffs and Trejo clearly managed to sever them in

practice and continue their relationship, even after exclusivity was destroyed when

Trejo took the "Machete" role. *See Zajiek,* 283 F.2d at 132 (""[I]t seems highly

unfair to this court that we should be asked to knock out the entire contract when

the clause was apparently never enforced . . . "); *see also Fields v. QSP, Inc.,* No.

CV 12-1238 CAS PJWX, 2012 WL 2049528, at \*10 (C.D. Cal. June 4, 2012).

With respect to Utah law, "contract provisions are severable if the parties

intended severance at the time they entered into the contract and if the primary

purpose of the contract could still be accomplished following severance." *Sosa v.

Paulos*, 924 P.2d 357, 363 (Utah 1996). "This intent should be ascertained first

from the four corners of the instrument itself, second from other contemporaneous

writings concerning the same subject matter, and third from the extrinsic parol evidence of the intentions." *Mgmt. Servs. Corp. v. Dev. Associates*, 617 P.2d 406, 408 (Utah 1980). Consequently, severance may be applicable under Utah law as well.

### iii. Modification

As raised in their Opening Brief, Plaintiffs could allege that Trejo and Plaintiffs had modified the understanding of their obligations under the agreements. Modification is a change in the obligation by a modifying agreement, which requires mutual assent, and must ordinarily be supported by consideration, and it need not be express, but may be implied by conduct. *Cal. Civ. Code.* § 1698; 1 WITKIN, SUMMARY 10TH (2005) *Contracts*, § 964, p. 1055; *Diamond Woodworks, Inc. v. Argonaut Ins. Co.,* 109 Cal.App.4th 1020, 1038 (2003); *see also Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.*, 977 P.2d 541, 548 (Utah 1999).

Again, while Medina considered Trejo providing his acting services in "Machete" and "Machete Kills" were a violation of the Acting Agreement, the parties nevertheless continued to work with each other, including in exchange for new promises by Trejo to support and promote "Vengeance" "all the way to the bank." Defendants do not address this doctrine and thus seemingly concede its potential application.

### iv.    Promissory Estoppel

Plaintiffs could amend to allege a theory of promissory estoppel with Trejo. "The purpose of this doctrine is to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange." *Raedeke v. Gibraltar Sav. & Loan Assn.*, 10 Cal.3d 665, 672 (1974). In support of a contract without modification, or in conjunction with modification principles, promissory estoppel can support the finding of a valid contract. *See, e.g., Sutherland v. Barclays Am. / Mortgage Corp.,* 53 Cal.App.4th 299, 312 (1997). *See also Youngblood v. Auto-Owners Ins. Co.,* 158 P.3d 1088, 1092 (Utah 2007). Defendants do not address this doctrine.

### v.    Novation

Likewise, Plaintiffs could allege that the parties underwent a novation. A novation requires an intent to substitute a new obligation, terminating the old one. *Cal. Civ. Code* §§ 1530, 153. Whereas a modification of a contract alters only certain portions of the contract, novation wholly extinguishes the earlier contract. *Davies Mach. Co. v. Pine Mountain Club, Inc.*, 39 Cal.App.3d 18, 25 (1974). "The intention of the parties to extinguish the prior obligation and to substitute a new agreement in its place must clearly appear." *Hunt v. Smyth*, 25 Cal.App.3d 807, 818 (1972). *See also Horman v. Gordon,* 740 P.2d 1346, 1352-53 (Utah Ct. App. 1987); *Fanucchi & Limi Farms v. United Agri Products*, 414 F.3d 1075, 1082 (9th

34

Cir. 2005). Defendants do not address this doctrine and seem to concede its potential application.

### vi. Defendants' Waiver Arguments Should be Rejected

Defendants argue that Plaintiffs waived a severance argument (or novation, modification, or promissory estoppel) on appeal should be rejected. But *Riggs v. Prober & Raphael,* 681 F.3d 1097, 1104 (9th Cir. 2012) and other cases only hold that Plaintiffs cannot add new claims on appeal. This Court has also said that "[b]ecause claims, not *arguments in support of claims,* are waived, we may address [the appellant's] contention." *California Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1185 n. 18 (9th Cir. 2007); *see also Yee v. Escondido,* 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim . . . ").

None of the severance, modification, novation, or promissory estoppel arguments contradict the actual facts alleged in Complaint. They are merely alternative legal arguments that support what Plaintiffs has alleged all along: that he had a valid enforceable relationship with Trejo (and others). *See, e.g., United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004). Plaintiffs submit that proffering theories or allegations that may address deficiencies in the allegations such as the ones identified here are appropriately raised at this time before this Court.

### 2. Defendants Misstate the Law on Non-Compete Covenants

#### i. In-Term Versus Post-Term Covenants Not to Compete Post-*Edwards*

With respect to whether the Acting Agreement violates Section 16600, Plaintiffs respectfully submit that there is at least an ambiguity in the law as to the applicability of *Edwards v. Arthur Andersen LLP,* 44 Cal.4th 937 (2008) with respect to *in-term* non-compete covenants. This Court in *Comedy Club, Inc. v. Improv W. Associates*, 553 F.3d 1277, 1291 (9th Cir. 2009) stated that no Ninth Circuit or California precedent held "that in-term covenants not to compete of any scope are necessarily valid." After examining *Dayton Time Lock Service, Inc. v. Silent Watchman Corp.*, 52 Cal.App.3d 1 (1975) and *Kelton v. Stravinski*, 138 Cal.App.4th 941, 946 (2006), this Court then determined that the covenant at issue was overbroad, but enforced a more limited version of the covenant.

Especially in the context of the entertainment industry (and perhaps other industries), section 16600 and *Edwards* should not be read to prohibit exclusivity provisions wholesale, in an in-term employment arrangement. Plaintiffs request that this Court determine, in accordance with predicting how the California Supreme Court would rule, that certain in-term exclusivity arrangements may be lawful. *Hayes v. Cty. of San Diego,* 658 F.3d 867, 871 (9th Cir. 2011).

### ii. Likewise, Utah Law Does Not Dictate that the Acting Agreement is Invalid as a Matter of Law

Hinojosa also argues that even under Utah law, the Acting Agreement constitutes an unlawful restraint as a matter of law. Yet simultaneously, Hinojosa cites to *Sys. Concepts, Inc. v. Dixon*, 669 P.2d 421 (Utah 1983) and *Bad Ass Coffee Co. of Hawaii v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237 (D. Utah 2009), both cases dealing with a preliminary injunction hearing, and *Allen v. Rose Park Pharmacy*, 237 P.2d 823, 828 (Utah 1951), reversing a judgment after trial: cases where the weighing of disputed evidence occurred to determine enforceability. Hinojosa's citation from *Lambertsen v. Utah Dep't of Corr.,* 922 F. Supp. 533 (D. Utah 1995), apparently offered to support that Fed. R. Civ. P. 12(b)(6) motion can determine such reasonableness, actually cites the standard for a Rule 56 motion, where disputed evidence is weighed.

Therefore, under Utah law, at least at the pleadings stage, the Acting Agreement should not be deemed invalid as a matter of law.

### iii. Defendants Do Not Provide Any Authority to Contradict that the MLA is an Enforceable Assignment of Trejo's Right of Publicity

With respect to the MLA, while Defendants describe Plaintiffs' description of that agreement as a license of the right of publicity as a new "characterization" or a "reformed" restraint on trade (Hinojosa Br. at 18), the actual terms of the

MLA make clear that Trejo is licensing his right of publicity. The "Property" being licensed is "The name . . . , image, likeness, signature, endorsement, and voice of the celebrity Danny Trejo" (2 ER 122, ¶ 1.) *See, e.g., KNB Enterprises v. Matthews,* 78 Cal.App.4th 362, 366 (2000).

Hinojosa argues that the MLA, however, conveys more than just that: "Plaintiffs assign themselves all copyright and trademark interests that could arise from Trejo's future work . . . " and "practically unlimited control over Trejo's career" (Hinojosa Br. at 17-18). Hinojosa's interpretation is clearly not the only reasonable position, or even the most reasonable one (indeed, it is contradicted by Medina's anti-SLAPP declaration and Plaintiffs' and Trejo's actual course of performance with each other (*see* 3 ER 458:26-459:27)). Therefore any question as to whether the MLA is actually ownership of all of Trejo's future work should be construed in favor of Plaintiffs. *See Orion Tire Corp. v. Goodyear Tire & Rubber Co., Inc.,* 268 F.3d 1133, 1138 (9th Cir. 2001) ("Under California law ... the interpretation of contract terms generally[ ] is a question of the intent of the parties and is typically a question of fact for the jury.").

Hinojosa seeks to distinguish *Timed Out, LLC v. Youabian, Inc.,* 229 Cal.App.4th 1001 (2014) on the basis that it only assigned "the right to bring a claim for misappropriation of the right of publicity, not a transfer of the right of publicity itself." (Hinojosa Br. at 20.) However, not only does the court expressly

state that "[t]he trial court erred in holding the right of publicity cannot be assigned" (*id.* at 108), it also holds that "even if Plaintiff received only 'a right to sue' to exclude Defendants from exploiting the Models' images, that right alone suggests Plaintiff obtained an exclusive right . . . " *Id.* at 1011.

## B. The District Court Erred in Dismissing Plaintiffs' Claims Under Fed. R. Civ. P. 12(b)(6) and *Twombly* Standards

### 1. Plaintiffs Sufficiently Plead Tortious Interference Claims, Or, At A Minimum, Have Established That Granting Plaintiffs Leave To Amend To Try To Do So Would Not Be Futile

#### i. Plaintiffs Sufficiently Plead Knowledge of The MLA And Acting Agreement, Or Could Amend To Do So

The Complaint sufficiently alleges as is that Rodriguez had knowledge of Medina's contractual relationship with Trejo, as well Medina's contractual relationships with others. (2 ER 33:8-13.) It further alleges that between 2007 to 2009, "[E]ither in the course of such communications or otherwise, *RODRIGUEZ became aware by no later than 2008 or 2009 that Trejo had entered into the contractual and economic relationship with PLAINTIFFS . . . .*" (2 ER 33:23-34:2) (emphasis added). The Complaint further alleges that Plaintiffs engaged in a conspiracy to destroy the anticipated *Vengeance* franchise, and through numerous acts. (2 ER 34:23-35:14, 42.)

From the anti-SLAPP submissions, there is also ample material in the record here to show that Medina could be even more specific about Rodriguez's

knowledge of the Medina-Trejo relationship. (*See* 3 ER 457:7-13, 474:18-475:10; 5 ER 794-796.)

Such existing allegations, and certainly the more specific allegations possible on amendment, are sufficient to establish the defendants' knowledge of the contracts for an intentional interference claim. With respect to the knowledge element, "the Plaintiff does not have to identify the specific contractual relations which have allegedly been disrupted." *Sebastian Int'l, Inc. v. Russolillo*, 162 F.Supp.2d 1198, 1203 (C.D. Cal. 2001)); *see also* RESTATEMENT (SECOND) OF TORTS § 766 (1979). Accordingly, *Rodriguez need not have ever seen the Acting Agreement or MLA or know its specific terms*; Rodriguez need only be aware of Medina's contractual relationship with Trejo, and that Rodriguez had the intent to disrupt it, or substantial certainty that such disruption would occur. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1127 (1990).

The Complaint also adequately alleges that Defendants disrupted Medina's contractual and prospective economic relationships with third parties other than Trejo. *See* 2 ER 47:24-25 ("PLAINTIFFS had valid and existing contractual relationships, including without limitation with Trejo and React Games"). *Ramona Manor Convalescent Hosp. v. Care Enterprises*, 177 Cal.App.3d 1120, 1133 (1986) holds that it is unnecessary for Defendants to even know the identity of the other contracting parties to be liable. Accordingly, while Rodriguez and Hinojosa

may not necessarily have known that Medina had specifically contracted with

React Games for the creation of the *Vengeance: Woz with a Coz* app, Medina

alleged that Defendants were well aware that an app game existed, and the

allegations are that Rodriguez was directly instructing Trejo not to support it.

> **ii.   Plaintiffs Sufficiently Allege an Independent Wrong in Connection with Their Intentional Interference with Prospective Economic Relationships Claims, Or Could Amend To Do So**

Rodriguez also argues that the Complaint fails to allege an independent

wrongful act in connection with Medina's prospective economic relations claims.

(Rodriguez Br. at 30.)  But Rodriguez ignores the allegations that in 2012, with

"Machete Kills"' upcoming release, and with the threat of "Vengeance" troubling

Rodriguez's "Machete Kills" investors (both with respect to Trejo being involved

with *Vengeance*'s marketing, and also *Vengeance* potentially competing with

*Machete Kills* at the box office), Rodriguez and Hinojosa engaged in concerted

acts of defamation and other wrongful conduct (2 ER 42:14-20).

In November 2012, after having recorded their voices for the app game but

before Medina had secured distribution agreements for *Vengeance,* the Wozniaks

informed Medina that they had been contacted by an individual who had

"intimidated and threatened the Wozniaks to cease support for" *Vengeance*.  (2 ER

43:57-44:7.)  That individual falsely represented that "PLAINTIFFS had no

contract or other business relationship with Trejo, and had not worked with Trejo for ten years, and that MEDINA in particular was a 'fraud' and 'con man' and was taking monies for himself . . ." (*Id*.) That individual then went on tell the Wozniaks (falsely) that "if the App Game went forward that the Wozniaks might be sued by 'an A list producer' " [*i.e.*, Rodriguez] (*Id.* at 44:8-28.)

Plaintiffs allege that Hinojosa and Rodriguez were responsible for this individual's communication to the Wozniaks. (2 ER 43:6-44:7.)

There is also other wrongful conduct alleged here that Defendants are ignoring. Plaintiffs clearly allege and provided supporting evidence in their anti-SLAPP opposition that, for instance, Rodriguez told Trejo not to work with Plaintiffs and the Wozniaks. Rodriguez's acts of interfering with Trejo's valid contract with Medina as part of stopping the Wozniaks from working with Plaintiffs is clearly an independently wrongful act (a tort) that can satisfy the element of Rodriguez's interference with Medina's other relationships not reduced to fully enforceable contracts, including the relationships with the Wozniaks, and the distributors with whom Medina was negotiating.

Moreover, Plaintiffs clearly allege that the triggering reason for Rodriguez and Hinojosa motivating to crush Plaintiffs' release plans was that Rodriguez's investors were unpleasantly surprised to learn that Trejo was non-exclusive to "Machete Kills" – because Rodriguez failed to disclose that in the financing

42

agreements with the investors.  (2 ER 38:9-40:9, 42:14-43:5; *see also* 5 ER 794-796 [Email chain from Rodriguez's partner Aaron Kaufman to Hinojosa, inquiring why Hinojosa had not yet "handled" the situation with Plaintiffs, and concerned about it because "the backers and distributor for Machete Kills are freaking out."]) Such a failure to disclose would be an independently wrongful act, possibly even federal and state securities fraud, as the Complaint alleges.

> **iii.** **The Allegations Regarding the Contractual and Prospective Relationships and Damages are Not Overly Speculative, And Plaintiffs Could Amend To Plead With a High Degree of Specificity If Needed**

Defendants argue that the district court did not err when it found that Plaintiffs' allegations of disrupted prospective economic relationships and damages speculative.  Defendants do not address Plaintiffs' argument that the district court order indicated that it rejected Plaintiffs' factual allegations, in violation of *Fed. R. Civ. Proc.* 12(b)(6) (*see Neitzke v. Williams,* 490 U.S. 319 (1989)), or that the district court required actual agreements to be entered into to recover on an intentional interference with *prospective economic advantage.* Instead, Defendants argue, for instance, that Plaintiffs needed to "articulate . . . details confirming the existence of such relationships with third party theatrical exhibitors and distributors."  (Hinojosa Br. at 49.)

However, while certainly Plaintiffs contend that they had relationships with third party theatrical exhibitors and distributors, the Complaint also provides that Medina had a prospective economic relationship with Trejo and the Wozniaks, and Medina describes those relationships extensively in the Complaint. Plaintiffs submit that it cannot reasonably be questioned (as indicated by Plaintiffs' relationship with those individuals before the alleged disruption) that those relationships "[contain] the probability of future economic benefit." *Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal.4th 376, 392-393 (1995). In any event, Medina identified specific potential distribution relationships in his anti-SLAPP declaration, supporting amendments if necessary. (3 ER 474:18-475:2; 5 ER 800-826.)

### iv. The Intentional Interference with Economic Relations Claim Brought under Utah Law Should be Allowed to Proceed

Finally, while the elements for stating a claim under intentional interference with prospective economic advantage under California law, and intentional interference with economic relations under Utah law, are similar, there are conflicts in the application of California and Utah law on Plaintiffs' claims. As discussed previously, whereas California has a strong policy in preventing the enforcement of non-competition clauses, Utah courts generally will uphold a covenant not to compete if reasonable. Consequently, the causes of action brought

under both laws should be allowed to proceed. *See, e.g., In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2012 WL 1322884, at \*3 (C.D. Cal. Apr. 16, 2012) (in securities litigation, court stating that if Blue Sky laws are additive, then multiple laws may be at issue simultaneously).

## 2. Plaintiffs Sufficiently Pled Negligence

In their Answering Briefs, defendants argue that Medina cannot show that either Hinojosa or Rodriguez owed Medina a duty of care. Hinojosa argues that Medina ignores *Biakanja v. Irving,* 49 Cal.2d 647, 650 (1958), which sets forth factors which determine when a third party not in privity may recover from negligence performance on the contract. (Hinojosa Br. at 54.) However, Medina specifically raised and analyzed the *Biakanja* case in his opposition brief to Hinojosa's Motion to Dismiss (3 ER 333-34). As cited by *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 804 (1979), *Biakanja* provides:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity *is a matter of policy and involves the balancing of various factors*, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Id.* at 650 (internal citations omitted). Moreover, under such an analysis, the *Biakanja* factors all weigh in favor of a finding that Hinojosa had a duty towards Medina.

45

"In Hollywood, talent agents act as intermediaries between the buyers and sellers of talent. Generally speaking, an agent's focus is on the deal: on negotiating numerous short-term, project-specific engagements between buyers and sellers." *Marathon Entertainment, Inc. v. Blasi*, 42 Cal.4th 974 (2008). Hinojosa, Trejo's talent agent, therefore acted in that capacity as a broker for Trejo's services, and Medina submits, Hinojosa had the duty to perform in that capacity competently (i.e., to be *truthful*) to protect and promote Trejo's interests, especially in connection with the third parties engaging in Trejo's services (and with whom Hinojosa was earning a commission). Courts have found such a third party liability in other broker contexts. *See, e.g., Holmes v. Summer,* 188 Cal.App.4th 1510, 1519 (2010) (real estate brokers); *Bus. to Bus. Markets, Inc. v. Zurich Specialties*, 135 Cal.App.4th 165, 172 (2005), *as modified* (Jan. 10, 2006) (insurance brokers).

The Complaint provides that "HINOJOSA engaged in misleading omissions or failures to speak, resulting in the intended implication . . . when in fact HINOJOSA had been aware of and has been commissioning the monies from the relationship for many years" (2 ER 43). [3] The Complaint also provides that, after

---

[3] As Medina's Opening Brief makes clear, however, even setting aside the validity of the Acting Agreement and the MLA specifically, Medina and Trejo had a longstanding relationship wherein Medina retained Trejo's acting services and exploited Trejo's celebrity. The Complaint alleges that Hinojosa was well aware of this longstanding relationship and received commissions from it. This is

Hinojosa's communication with the Wozniaks, "the Wozniaks withdrew active marketing and promotional support for the App Game (*id.*), and "Defendants' efforts (to disrupt Plaintiffs' relationships) were . . . successful . . . " (2 ER 46). Such injury was inflicted directly, was foreseeable, resulted in injury by disruption of the marketing and promotional plans of *Vengeance,* and was immoral.  Under *Biakanja,* this Court should therefore determine that Hinojosa has a duty towards Medina with respect to truthfully representing Trejo in his acting services and his obligations.

In her Answering Brief, Hinojosa argues that *Biakanja* holds that "potential liability to a third party only arises in the limited situation in which a professional *negligently performs a contractual obligation or violates an ethical obligation*." (Hinojosa Br. at 53.)  *Biakanja* actually does not state any such thing.  For instance, *Biakanja* cites approvingly to a group of cases where the addressee may recover from a telegraph company for losses because of the company's failure to deliver the message.  *See, e.g., W. Union Tel. Co. v. Bowman*, 141 Ala.175 (1904); *Barker v. W. Union Tel. Co.,* 134 Wis.147 (1908).  Medina submits that *Biakanja* cites to these cases to indicate that the occupation of the negligent actor and the nature of the obligation are not as controlling as are the actual *Biakanja* factors

---

sufficient under a principal-agency theory to support the finding of liability for negligence to third parties.

identified. If necessary, Medina can also amend to show that Hinojosa's client Trejo was actually a producer on the project, not only an actor. (3 ER 445:4-26.) For the agent of a producer on a film project to deny or denigrate the project reasonably seems like a violation of the expectancies of the other producers on the project.

## C. Leave to Amend Should Have Been Granted

Based on all of the errors addressed above, the motion to dismiss should be reversed, or at the least, leave should have been granted. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393 (9th Cir. 1986). Nowhere does the district court state in his order that it found every single one of Medina's claims futile. The district court also expressly determined that some of the allegations fatal to Medina's claims were simply not credible or "conclusory" – which, on those findings alone, do not and cannot justify denial of leave to amend. *See, e.g., Schreiber Distrib. Co.*, 806 F.2d at 1403 (abuse of discretion where district court "did not determine that the allegation of other facts could not possibly cure the deficiencies"); *see also Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 701 (9th Cir. 1988) (denial of leave to amend constitutes abuse of discretion where Ninth Circuit could " 'conceive of facts' that would render plaintiff's claim viable and [the court] could 'discern from the record no reason why leave to amend should be denied' ").

## VIII. RODRIGUEZ'S CROSS-APPEAL SHOULD BE DENIED

### A. The Anti-SLAPP Statute Applies Only When the "Gravamen or Principal Thrust" of the Claim is Protected Activity

To satisfy the first-step burden of establishing that a claim "arises from" protected activity, a defendant must do more than show that the claim mentions or implicates protected activity in some way. Many claims have some incidental connection to petitioning activity – SLAPP applies only when the "gravamen or principal thrust" of the claim challenges the protected activity itself. *Martinez v. Metabolife Internat., Inc.,* 113 Cal.App.4th 181, 193 (2003).

Under the "gravamen" test, "the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech." *City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002). In other words, a claim is not covered by the anti-SLAPP statute merely because the claim is directed at conduct that *led* to a lawsuit or other protected activity – the claim must be *directed* at the protected activity itself. *Id.*; *Aguilar v. Goldstein*, 207 Cal.App.4th 1152 (2012) (complaint that alleged defendants improperly ended negotiations for their own self-interest does not arise from protected activity even though defendants filed suit shortly after ending negotiations).

The statute cannot be invoked to shield business misconduct. The statute offers no protection for "wrongful conduct and speech . . . committed in a business capacity," *World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*, 172 Cal.App.4th

1561, 1569 (2009). *See also Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 63 F.Supp.2d 1127, 1130 (N.D. Cal. 1999)).

In his cross-appeal, Rodriguez summarily concludes that "any activities in connection with the *Machete Films*" are protected activity. (Rodriguez Br. at 53.) This ignores the *gravamen* test. For what matters under the well-established test is not whether (or how much) a claim mentions protected activity, but whether the *specific conduct being challenged as unlawful is protected activity*. For this reason alone, the motion should be denied. Rodriguez did not actually grapple with – and indeed even omitted from his recitation of the allegations in the Complaint – the claims that Plaintiffs actually alleged regarding the crushing for their competitive release plans and related misconduct. Where a moving defendant chooses to sidestep the plaintiffs' actual claims, it cannot possibly meets its burden of establishing that conduct that the defendant does not even want to discuss "arise from" protected speech. *See Braun v. Chronicle Publ'g Co.*, 52 Cal.App.4th 1036, 1043 (1997) (moving party must demonstrate "that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e).).

**B. The Gravamen Of Medina's Claims Is Rodriguez's and Hinojosa's Business Misconduct in Crushing a Competing Creative Project**

Each of Medina's claims directly challenge an act of business misconduct. Medina brought his state law claims because, long after Rodriguez had already cast

Trejo in *Machete* and *Machete Kills,* Rodriguez then engaged in deliberate acts of fraudulent representations and conspiracy, to induce third parties such as the Wozniaks to repudiate their dealings with Medina and therefore eliminate any possibility of *Vengeance's* competition with *Machete Kills*.  Medina's claims are classic business torts, and Rodriguez cannot change the misconduct's essential nature by bootstrapping protected activity to them.

Instead, Rodriguez argues that his conduct is shielded because movies are "prototypical First Amendment-protected work."  (Rodriguez Br. 52.)  But, while SLAPP protects "free speech in connection with a public issue," *Cal. Code Civ. Proc*. § 425.16(e)(4), it has never applied simply because claims involve a movie. *See, e.g., Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal.App.4th 873, 884 (2011) (denying in part rap artist's anti-SLAPP motion to strike on film production company's breach of contract claim in connection with documentary); *see also In re Episcopal Church Cases*, 45 Cal.4th 467, 478 (2009) ("The additional fact that protected activity may lurk in the background . . . does not transform a property dispute into a SLAPP suit.").  The gravamen of Plaintiffs' claims are not Rodriguez's "movies"; nor is the gravamen of any claim ever "movies."  The gravamen test is about a defendant's alleged speech or conduct and "movies" are not "defendants."

Moreover, Medina alleges that Rodriguez interfered with Medina's relationship with Trejo in *numerous ways,* including by forbidding Trejo to continue on reshooting or editing scenes in *Vengeance* or to be involved whatsoever with marketing and promoting the movie.  Those activities do not implicate Rodriguez's right of free speech*,* and the misconduct that cannot reasonably be interpreted to reflect Rodriguez's "intent to convey a particularized message" about *Machete* or *Machete Kills*.  *Hilton v. Hallmark Cards*, 580 F.3d 874, 884 (9th Cir. 2009).

Defendants also argue that *Weinberg v. Feisel,* 2 Cal.Rptr.3d 385 (2003) and *Albanese v. Menounos,* 218 Cal.App.4th 923 (2013)  are irrelevant because "Medina does not contend that Rodriguez defamed him . . ."  (Rodriguez Br. at 56, n. 17.)  Yet, the Complaint plainly provides that "persons acting for HINOJOSA and/or RODRIGUEZ contacted Steve and/or Janet Wozniak and intimidated and threatened the Wozniaks to cease any support of . . . " Medina's projects.  (2 ER 43).  "Such intimidation and threats included making a series of intentionally false statements to the Wozniaks concerning PLAINTIFFS, with the intention of damaging and destroying PLAINTIFFS' relationships with the Wozniaks and their other relationships and agreements . . . " (*Id.*)  (*See also* 3 ER 474:17-481:26.)

### C. At Best for Rodriguez, Medina's Complaint Presents "Mixed Causes of Action" and the Better Rule is that Such Mixed Causes of Action be Allowed to Proceed

If this Court were to determine that any of Medina's causes of action contain multiple claims – claims that challenge activities that are protected under California's anti-SLAPP statute, and claims that are *not* protected, also known as a "mixed" cause of action – and that Medina did not show a probability of prevailing on all parts of the claim, this Court should nevertheless allow the entire cause of action to proceed: "[o]nce a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff has *established* that its cause of action has some merit and the entire cause of action stands." *Mann v. Quality Old Time Serv., Inc.*, 120 Cal.App.4th 90, 106 (2004) (emphasis in original).

California "[a]ppellate courts have wrestled with the application of the anti-SLAPP law where . . . a single cause of action includes multiple claims, some protected by that law and some not." *Cho v. Chang*, 219 Cal.App.4th 521, 526 (2013). The anti-SLAPP law is silent on the matter, and California's appellate courts are split on it. *See United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2015 WL 6955086, at *8 (N.D. Cal. Nov. 10, 2015) (discussing cases).

While the *Cho* court held that "the better view . . . is that the trial court may strike the allegations in the cross-complaint attacking the protected activity while allowing the unprotected theories to remain," *Cho*, 219 Cal.App.4th at 523, subsequent courts have disagreed with this approach. In *Baral v. Schnitt*, the appellate court rejected *Cho's* reasoning and cited to *Mann* as well as *Oasis W.*

53

*Realty, LLC v. Goldman*, 51 Cal.4th 811 (2011) in holding that "the balance tips in favor of allowing mixed causes of action containing potentially meritorious claims to proceed unencumbered by the special procedures of the anti-SLAPP statute." 223 Cal.App.4th 1423 (2015). The California Supreme Court granted review of the *Baral* decision on May 13, 2015. *Baral v. Schnitt*, ––– Cal.4th ––––, 186 Cal.Rptr.3d 840 (2015).

Medina submits that this Court should follow *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, and "predict" that the California Supreme Court will affirm *Baral's* reasoning. *Hayes v. Cty. of San Diego*, 658 F.3d 867, 871 (9th Cir. 2011). In the alternative, Medina requests that this Court wait on the California Supreme Court's ruling in *Baral*.

> ### D. <u>Prejudicial Dismissal of Medina's Claims Are Not Properly Before This Court on an Anti-SLAPP Basis In Any Event to the Extent Any Question Turns on Evidentiary Determinations, or If Medina Can Show Leave to Amend Would Not Be Futile</u>

Because Rodriguez cannot satisfy his threshold burden under the first stage, there is no basis for inquiry further. However, if this Court were to determine that the anti-SLAPP statute *does* apply, the proper course would still be to remand the case with Plaintiff given the opportunity to conduct discovery, *or* proceed with the second step of the anti-SLAPP analysis – but under a *Fed. R. Civ. Proc.* 12(b)(6) standard. *See, e.g., Navellier v. Sletten,* 29 Cal.4th 82, 95 (2008) ("[B]ecause the Court of Appeal did not consider whether plaintiffs have established a probability

of prevailing (§ 425.16, subd. (b)), we shall remand the cause to permit the court to address that question in the first instance."); *see also Tuszynska v. Cunningham*, 199 Cal.App.4th 257, 267 (2011); *Fed. R. Civ. Proc.* 11(b)(3).

### E. **Medina Has Established that his Claims have "Minimal Merit"**

Medina asserts against Rodriguez claims for intentional interference with contract and prospective economic advantage under California law and Utah law.

In his brief, Rodriguez's only argument against those claims on an evidentiary basis is that Rodriguez's own testimony provides that he "had no knowledge of any purported contracts at all between Medina and Trejo; much less knowledge of any purported agreement that Trejo would not act in any 'vigilante' movies" (Rodriguez Br. at 58.) Rodriguez then conclusorily states that Medina himself "provided no evidence that Rodriguez even knew of the purported contracts between Medina and Trejo; much less that he intentionally induced Trejo to breach them." (*Id*.)

Medina submitted copious evidence that Rodriguez knew about the contracts, from multiple witnesses, and including Medina's own testimony that he personally witnessed Rodriguez and Trejo discussing Trejo's business relationship with Medina and what it entailed and required. (*See* 3 ER 470:9-20, 484-487.) There is even an email from Rodriguez's producing partner, Aaron Kaufman, to Hinojosa appearing to pressure her to "take care" of the situation with Medina

(which goes more directly to wrongful act and intent, but may support an inference of knowledge).  (*See* 5 ER 797-799.)  This email alone makes Rodriguez's declaration less than complete by itself as to eliminating Rodriguez's liability, as Rodriguez leaves open in his declaration that someone like Kaufman, acting for the Rodriguez entities, actually did the dirty work.  *See, e.g.*, *Reusche v. California Pac. Title Ins. Co.*, 231 Cal.App.2d 731, 736 (1965) ("A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud. The principal is liable although he is entirely innocent, although he has received no benefit from the transaction, and although the agent acts solely for his own purposes."  *See also* REST. OF THE LAW OF AGENCY, §§ 261, 262; *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1146 (N.D. Cal. 2003).

Rodriguez also disrupted Medina's contractual or prospective economic relationships with third parties other than Trejo.  While Rodriguez may not have known that Medina had specifically contracted with React Games for the creation of the *Vengeance: Woz with a Coz* app, Rodriguez was well aware that an app game existed.  Danan Smith, one of the producers for "Vengeance," testified in his declaration that during the development of the app game, Trejo abruptly ceased communicating directly with Smith, instead directing him to communicate with his

56

agent Hinojosa instead.  (3 ER 484-487.)  When Smith called Hinojosa, she communicated to Smith that "Rodriguez was very upset with Danny for being involved with the Project and the app game.  She said that Rodriguez did not want Danny involved any more or Rodriguez might not work with Danny anymore or even that Rodriguez might sue Danny and others" (*Id.*)  Such testimony is admissible under *Fed. R. Evid.* 801(d)(2) and/or *Fed. R. Evid.* 804(b)(3).

As to Rodriguez's intent, a jury may "infer culpable intent from conduct 'substantially certain to interfere with the contract.' " *Savage v. Pac. Gas & Elec. Co.*, 26 Cal.Rptr.2d 305, 314 (1993).

Medina provides evidence of emails between Hinojosa and an individual named Peter McArdle, subject line "Steve Wozniak and Medina / Vengeance Computer Game."  (3 ER 488-492; 3 ER 756-761.)  As reflected in the emails, McArdle purportedly sent an electronic communication via Facebook to Steve Wozniak through Facebook on November 9, 2012 where McArdle represented to Wozniak that he worked for Trejo, and purported to warn Wozniak:

> "Hi Woz,
>
> My name is Peter McArdle and I work for Danny Trejo.  I am contacting you on his behalf to warn you about a person named Gilbert Medina, who you may have already encountered.
> . . .
> Medina uses [*Vengeance*] to attract investors, and steals their money. . . Danny Trejo has no participation in the video game that you have posted on FB page. He has not authorized it, does not appear in it, and quite frankly, it's a complete scam. Here is his agent's phone number

if you require verification: [with Hinojosa's contact information then listed]."

That email also shows a response (presumably Wozniak's):

"Thank you very much. I will definitely look into this. I do not want to be in such a situation or position. I do not ever want to be connected to anything that would be like taking advantage of another for money."

(*Id.*) Outside of the Facebook communications, McArdle communicates to Hinojosa, "I think we can safely say that deal is dead."

On November 18, 2012, Janet Wozniak communicated with Medina and clearly seemed convinced McArdle's statements were true, or was at least uncertain. (3 ER 477:23-478:8; 5 ER 770-74.) Around that time, Danan Smith and Hinojosa had multiple phone calls. (3 ER 484-487.) Hinojosa said to Smith that "she had called the Wozniaks and had threatened the Wozniaks with a lawsuit by Robert Rodriguez if they continued to be involved with the Project or the app game." (*Id.*) Such testimony is admissible under *Fed. R. Evid.* 801(d)(2) and/or *Fed. R. Evid.* 804(b)(3), if trial admissibility were even required at this stage, which it is not.

Medina testifies that, after Trejo and the Wozniaks refused to work with him, Medina was unable to secure meaningful release for *Vengeance* with distributors and exhibitors, and in no small part because there was a big "difference between a movie distributed with a marketing and promotional plan and [a movie] without one." (3 ER 480:25-481:19)

58

Based on all of the above, Medina submits that a trier of fact may infer that Rodriguez engaged in a conspiracy with others to destroy Medina's contractual relationship with Trejo, the contractual relationships with third party companies Medina had worked with in connection with the MLA, such as Fusion-io (3 ER 464:25-465:4, 4 ER 656-659), the contractual relationships Medina had made in connection with the *Vengeance: Woz with a Coz* app, including React Games, and the prospective economic advantage he would have had with the Wozniaks and the exhibitors and distributors he had been negotiating with prior to Rodriguez's conspiring with Hinojosa and McArdle.

Intentional interference with prospective economic advantage "does not require a plaintiff to plead that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage." *Korea Supply Co.,* 29 Cal.4th at 1153. The intent requirement only requires that "*defendant knew that the interference was certain or substantially certain to occur as a result of its action.*" *Id.* (emphasis added). Here, it may be reasonably inferred that the defendants knew that their acts of making false statements about Medina and ITN Flix would disrupt the relationships that would be key to *Vengeance's* successful distribution and exhibition.

The tort also requires, however, that "defendant engaged in an independently wrongful act." *Della Penna*, 11 Cal.4th at 376. Medina submits that the

defamatory statements made by Hinojosa and McArdle about Medina may

constitute such independent wrongful conduct.

Medina therefore respectfully submits that such evidence thus meets the

"minimal merit" test of the anti-SLAPP statute for these claims.

### F. No Attorneys' Fees Should be Awarded Under California's Anti-SLAPP Statute

Similarly, this Court should decline to award any attorneys' fees to

Rodriguez if leave to amend is granted.

"[D]efendants sued in federal courts can bring anti-SLAPP motions to strike

state law claims and are entitled to attorneys' fees and costs when they prevail."

*Verizon*, 377 F.3d at 1091. But a party is not considered to have "prevailed"

where "the results of the motion were so insignificant that the party did not achieve

any practical benefit from bringing the motion." *Mann v. Quality Old Time Serv.,*

*Inc.,* 139 Cal.App.4th 328, 340 (2006); *see also Moran v. Endres,* 135 Cal.App.4th

952, 956 (2006); *Brown v. Elec. Arts, Inc.*, 722 F.Supp.2d 1148, 1156 (C.D. Cal.

2010); *see also Gardner v. Martino,* 563 F.3d 981, 991 (9th Cir. 2009).

### IX. CONCLUSION

This Court should reverse the order granting the Hinojosa Defendants'

motion to dismiss under *Fed. R. Civ. Proc.* 12(b)(6) in its entirety, or in the

alternative, reverse as to the denial of leave to amend and remand to the district

court with a direction to grant such leave. This Court should also reverse the

district court's purported grant of Defendants' anti-SLAPP motion to strike, and find that any anti-SLAPP statute is inapplicable to Medina's claims, or in the alternative, find that Medina had established a probability of prevailing on his claims, or remand for the district court to make such a determination in the first instance.

Respectfully submitted,

ANDERSON YEH PC

Edward M. Anderson
Regina Yeh

DATED: May 26, 2016         By:      /s/ Edward M. Anderson_____
                                    Edward M. Anderson
                                    Counsel for Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,969 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman typeface.


DATED: May 26, 2016          By:     ___/s/ Edward M. Anderson_____
                                      Edward M. Anderson
                                      Counsel for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing APPELLANTS'

REPLY BRIEF AND ANSWERING BRIEF ON CROSS_APPEAL with the Clerk

of the Court using the CM/ECF system on May 26, 2016, which will send

notification of such filing to the e-mail addresses denoted on the Electronic Mail

notice list.

I certify under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.

DATED: May 26, 2016          By:     ____/s/ Regina Yeh_____
                                              Regina Yeh